UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT ALLEN SHUMATE,

                    Plaintiff,                      Case Number 20-10856

v.                                                Honorable David M. Lawson

CITY OF ADRIAN and JEREMY POWERS,

                    Defendants.

_____/

**OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

During a daylight encounter in a public parking lot that began with a traffic stop over an improper license plate, Adrian city police officer Jeremy Powers encountered plaintiff Robert Shumate, who was behaving badly.  Powers reacted — likely overreacted (also behaving badly) — by deploying his taser and taking Shumate to the ground.  The defendants now challenge Shumate's ensuing excessive force civil rights lawsuit with a motion for summary judgment, arguing qualified immunity, among other things.  Because the available evidence, including the officer's body camera video recording of the events, would permit a reasonable jury to conclude that Powers used unreasonable force in violation of Shumate's clearly established Fourth Amendment rights, the motion will be denied.

I.

The case arises from a September 27, 2019 encounter in the parking lot of a CVS pharmacy in the City of Adrian, Michigan, which involved defendant Officer Powers, plaintiff Shumate (then age 61), and Shumate's daughter, Amy Shumate, who was pregnant at the time.  The parties each submitted copies of a video and audio recording covering the encounter that led to the plaintiff's arrest.

The encounter occurred around 9:35 in the morning.  The exhibited segment of the body cam video begins with defendant Officer Powers approaching Amy Shumate, who is seated in her car (a Chevrolet Impala) in the parking lot.  Powers greets Ms. Shumate and asks why the license plate on the car appears in motor vehicle registration records as associated with an Oldsmobile. She responds that she recently bought the car and was not able to obtain a new registration since she had been out of work, so she transferred the plate from another car that she recently sold.  She also admits upon inquiry that the vehicle is not insured.  Powers returns to his cruiser for some computer activity, and he then comes back and tells Ms. Shumate that her vehicle will be impounded due to being uninsured.

Officer Powers asks Ms. Shumate if there is any contraband in the car, and she says no. Powers then tells her to get out of the car and give him the keys, and he issues a misdemeanor citation.  When Ms. Shumate attempts to reach into the car to recover some belongings, Powers begins screaming at her to get out of the car and "go stand over there."  They trade verbal barbs, with Powers telling her to "grow up," and Ms. Shumate responding "f*** you."  Powers then proceeds to riffle through items in the passenger area of the car, examining receipts, a prescription pill bottle, and credit cards, among other various personal items.  He also appears to search under the front seats and examines a pile of CDs or DVDs found on the rear seat.  Then he searches through bags of various detritus that are discovered in the trunk of the car.  While this is occurring, Ms. Shumate calls someone on her cell phone (presumably the plaintiff).

After searching the vehicle for several minutes, Powers asks Ms. Shumate what she wants out of the car, and she says that she wants "medical papers," pills, and a diaper bag.  Powers gathers various items in a plastic bag on the front seat.

At timestamp 22:10 minutes in the video, a pickup truck arrives, parks beside Ms. Shumate's vehicle, and plaintiff Robert Shumate gets out.  Powers asserts that he recognized Shumate from "previous encounters."  As soon as Shumate gets out of the truck, Powers barks at him, "What?"  Shumate responds, "You got a problem with me now?"  Powers then orders Shumate to leave, and Shumate says (sic), "I ain't leavin' nowheres, this is a private property." Powers then says, "Then don't interfere with what I'm doing."  Ms. Shumate is heard (off camera) saying loudly, "You done what you did!"  The plaintiff then says, while pointing at Powers, "You're an asshole!"  He then walks a short distance away to where Ms. Shumate is standing. Powers makes a radio call, and the plaintiff says, "Call backup, I don't give a ****."  Shumate mutters more gripes while pacing around the parking lot, and then tells Powers to finish up "so we can go home."  Powers responds, "Don't tell me what to do."

At this point in the interaction (22:53 minutes, around 40 seconds after the plaintiff arrived), Shumate begins walking toward the driver side of his truck while looking at the ground, perhaps complying with Powers's command to leave.  But Powers rapidly approaches him, commanding him, "Stay out of your car, don't go in that car."  Shumate then says loudly, "f*** you," and accompanies the insult with a rude hand gesture.  At 22:55 minutes, Powers appears to be grabbing at and rapidly advancing on Shumate, ordering him to "Turn around," and "Put your hands behind your back."  Shumate backs away, saying, "I ain't done shit to you."  At 22:59, Powers draws his taser, and the video shows him pointing the weapon at Shumate, who says "don't tase me."  Powers screams, "Put your hands behind your back right now!" and "Lay down!" Shumate continues backing away across the parking lot away from his truck (as previously commanded by Powers), with his arms at his sides, saying (sic), "I ain't doing shit, cause I ain't done nothing."

At 23:07 minutes, Powers fires the taser, which impacts Shumate mid-chest, and the plaintiff falls to the ground, crying out. The crackling sound of the taser continues as Powers gets on top of the plaintiff, who now is lying on the asphalt on his stomach, and Powers yells "Turn the f*** around!" and "Put your hands behind your back!" He continues screaming, "Put your hands behind your back!" while holding the taser against Shumate's back, as the plaintiff is pinned on the ground. At 23:22 minutes, Powers screams several times "Stop resisting!" and the taser is heard activating again (apparently in "drive stun" or direct contact mode). Shumate cries out again from the contact shock.

The body cam video at this point is jumbled during a physical scuffle, but at points Shumate is seen on his back on the asphalt, facing up at Powers, and Ms. Shumate approaches saying (sic) "Get offa him!" Powers screams "Turn the f*** around!" and calls on his radio that he is "Fighting with one." Shumate responds (sic), "Yeah, you beatin' me up and I ain't done shit. Do you got a body cam?" Ms. Shumate calls out indicating she is taking pictures with her phone (one of the photos depicting the struggle was included by the plaintiff in his motion brief). The tussle appears to subside around 24:09 minutes, when Shumate says, "I'm not resisting," and Powers again calls on his radio, "Fighting with one." The plaintiff, still pinned on the ground by Powers, then says, "You know I got medical problems," and Ms. Shumate says, "Yeah, he does!"

Powers yells at Shumate to "Turn over!" again, and it appears that Shumate attempts to get up off the ground, at which point Powers struggles with him and yells again, "Stop resisting!" At 24:54 minutes, Powers (out of breath) yells, "Lay down!" and Shumate responds, "I am!" although he appears to be kneeling with his hands and knees on the ground, while Powers bears down on him from behind. Ms. Shumate yells (sic), "How can he lay down, you got ahold of him, you dumb***?! Let go of him!" Powers continues panting for about 10 seconds while the pair remain

in a static grapple on the ground, and he then passes his taser from his right to his left hand, holding it in his left hand, while his left arm encircles Shumate's chest, while he calls out on his radio that he is in the "South side, CVS parking lot."  At 25:20 minutes, sirens are heard nearby.  Powers swaps his weapon between hands again and calls on the radio, "You just passed me."  At 26:15 minutes, he again swaps hands and calls, "You just passed me again."

At 26:36 minutes, the body cam view shows two more officers have entered the grapple, Shumate appears to be prone on his stomach again, and at 26:36 minutes the sound of handcuffs latching onto Shumate's wrists is heard.  The body cam view then recedes as Powers stands up, while several other officers handle Shumate, apparently without further incident, and one calls on his radio, "Everyone is secure."  Shumate continues to complain verbally, saying he didn't do anything, and "was not resisting," and several officers and Ms. Shumate are seen standing idly by while he is taken into custody.  Around 28:15 minutes, Powers walks away from the location of the scuffle to his police cruiser.

At the plaintiff's deposition, the plaintiff testified as follows about the progression of the parking lot incident:

> Q.      [S]o [Officer Powers is] investigating a crime and you decide that you're going to walk back to that vehicle, your vehicle, correct?
>
> A.      Yeah, because he told me to leave.
>
> Q.      You were going to get into your vehicle and leave; that was your purpose?
>
> A.      Yes, I was. I was going to leave.
>
> Q.      While your daughter was there?
>
> A.      Yes, because I wasn't going to get in it with him. I wanted to leave to avoid the confrontation with that officer. He stood over there glaring at me like — after I got there like I was a victim or something.
>
> . . .

- 5 -

Q.      Did you tell the officer that you were going to go away, that you were going to drive away?

A.      Yes, I did.

. . .

A.      [W]hen he ordered me to the ground I raised my hands because he pulled the taser out and I had my hands in the air.

Q.      Okay. And did he tell you to put your hands behind your back?

A.      No, he told me to get on the ground.

Q.      Did you get on the ground?

A.      No, I didn't.

. . .

Q.      Did he reach out to grab you and you pulled your hands away from the officer and backed away from him?

A.      He tried to grab me and I jerked away, yes, I did. He didn't touch me.

. . .

Q.      And you continued to back away from the officer at that point, correct?

A.      Yes.

Q.      And you screamed to him, "I ain't done shit to you," correct, sir?

A.      Right.

Q.      And was the taser still pointed at you at that point?

A.      Yes.

Q.      And the officer again ordered you to the ground?

A.      Yes.

Q.      And [did you] refuse that order?

A.      Yes.

Q.      And you continued to back away from the officer?

A.      Yes.

Q.      He still had his taser pointed at you?

A.      Yes.

Q.      And you screamed, "I ain't doing shit because I ain't done nothing," correct?

A.      Yes, and we even told him not to taser me because I had a problem with my heart. Me and my daughter both told him that and he did it anyway.

. . .

Q.      And the officer repeated his commands for you to lay down, correct?

A.      Yes.

Q.      And you continued to ignore those commands, correct?

A.      Yes.

Q.      And at that point as you were backing up the officer discharged his taser at you, correct?

A.      Correct.

. . .

Q.      Sir, when [the taser shock] took you off of your feet did the officer then try to take your hands and handcuff you?

A.      He tried to get my hands, but he came over and he started beating on my head and pounding on my back with his fists and punching me in the chest with his fists.

Q.      And is that before he was trying to handcuff you?

A.      Yes.

Q.      Did you refuse [] to allow him to get control of your arms?

A.      Yes, I did. I kept them in front of me so that he couldn't smash my face into the ground.

. . .

Q.      At some point you know he tried to take control of your left arm and you refused, correct?

A.     Correct.

Q.     And you tried — he tried to take control of your right arm and you refused that as well, correct?

A.     Correct.

Q.     And you heard him order you to stop resisting, correct?

A.     That's when he tasered me [again].

. . .

Q.     You continued to resist his efforts to get control of you after he tased you the second time, correct?

A.     Correct.

. . .

Q.     So the third time that he tased you, you still were resisting his attempts to get [] to your hands, correct?

A.     No.

. . .

A.     I was trying to keep him from smashing my face into the ground.

Q.     All right. Were you trying to stand up as well?

A.     No, he was on top of me and I didn't want him to smash me down so I kind of raised up a little bit, but I even told him, "Please get off of me stop tasering me."

. . .

Q.     After he tased you the third time did you comply with his commands and give your arms to him?

A.     No, he called for backup and when backup — he was still on top of me when backup got there and they raised me up and put my hands behind my back and handcuffed me.

Q.     Okay. So while he was there you still had your hands in front of you underneath your body and were not giving him [] your hands, correct?

A.     Correct, I'm not going to let him smash my face in the ground.

Q.     And you weren't going to let him handcuff you either, correct?

A.     No, because what was I under arrest for? That's what I want to know.

Q.     Okay. And then the officers — it wasn't until the other officers came that they pulled you up so to speak and they were able to get your hands from underneath your body and handcuff you, correct?

A.     When they got there I let them handcuff me.

Robert Shumate dep., ECF No. 21-4, PageID.163-166.

The video continues for several minutes while Powers remained at the scene.  At one point, Powers is heard asking if there is a way he could have Shumate's pickup truck impounded, but he abandons that effort when discouraged by other officers.  Around 30:39 minutes on the body cam video, Powers and several other officers gather idly around his cruiser while Powers recites his account of the incident.  The rest of the video is unremarkable, except for recording a discussion between other officers and Powers about the incident, and showing Shumate being conveyed from the scene on an ambulance gurney.  He was taken to a local hospital where he was treated and then released.  He subsequently was charged with resisting and obstructing a police officer and eventually pleaded guilty to a lesser charge of disorderly conduct.

The plaintiff filed his civil rights complaint in this matter on April 2, 2020.  He alleged that defendant Powers used excessive force to effectuate an arrest that he did not actively resist in violation of the Fourth Amendment.  He contends that the City of Adrian is liable because it failed to take remedial action when it knew that Powers displayed a pattern of escalating citizen confrontations, as evidenced by his record of 15 citizen complaints about his conduct over three years, seven of which resulted in discipline.  After discovery closed, the defendants timely filed their motion for summary judgment.

II.

The defendants contend that the amount of force used was reasonable to effectuate the arrest over the plaintiff's admitted resistance to defendant Powers's commands and attempts to handcuff him, and that Powers is entitled to qualified immunity because he "could not have known" that his use of force was unlawful, as he was "following established departmental procedure" when he deployed the taser.  The defendants also contend that the plaintiff has produced "no evidence" that the use of force, even if it was in some way improper, was motivated by any custom, policy, or practice of the City, and therefore the City is entitled to judgment as a matter of law.

As the parties well know, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

Summary judgment must be denied to the defendants when the record shows that there is a genuine material fact dispute on the elements of the plaintiff's claim. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587 (1986).  However, the plaintiff cannot demonstrate a genuine fact dispute when conclusive video evidence undermines his version of the

facts as he presents them. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The body cam video does not serve that purpose for the defendants here. Instead, it furnishes evidence that may support the plaintiff's case. Summary judgment is precluded in this case because questions of fact remain on this record about (1) whether defendant Powers used a reasonable degree of force to effectuate an arrest in the totality of the circumstances, and (2) whether the plaintiff at any point actively resisted the defendant's attempt to arrest him.

## A.

To assess claims that an officer that used excessive force in effectuating an arrest, the Court applies "the Fourth Amendment's unreasonable seizure jurisprudence." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009); *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)). The test is an objective one, requiring a "balancing [of] the consequences to the individual against the government's interests in effecting the seizure." *Ibid.* (citations omitted); *see also Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid.* (citing *Kostrzewa*, 247 F.3d at 639; *Graham*, 490 U.S. at 396). The focus is "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 607-08 (citing *Morrison*, 583 F.3d at 401; *Graham*, 490 U.S. at 396).

"'When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.'" *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). Those principles are clearly established. However, the Sixth Circuit has "held that mere noncompliance is not active resistance." *Woodcock v. City of Bowling Green*, No. 16-5322, 2017 WL 633385, at *4 (6th Cir. Feb. 16, 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323-24 (6th Cir. 2015) (holding that refusal to comply with an officer's command to step outside the apartment was not active resistance); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) ("If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more.")). The court of appeals has "long distinguished active resistance by arrestees from passive resistance." *Jackson v. Washtenaw County*, 678 F. App'x 302, 306 (6th Cir. 2017) (citing *Goodwin*, 781 F.3d at 323). "The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." *Ibid.* (citing *Goodwin*, 781 F.3d at 323; *Rudlaff*, 791 F.3d at 641). "The latter is generally shown by the lack of physical resistance or verbal antagonism." *Ibid.* (citing *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012); *Eldridge*, 533 F. App'x at 535).

Powers has asserted the defense of qualified immunity, which requires a closer look at the contours of the constitutional right asserted by the plaintiff. "[B]ecause 'immunity protects all but the plainly incompetent or those who knowingly violate the law,' this court must not 'define clearly established law at a high level of generality.'" *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018)).

The doctrine of qualified immunity insulates state actors from liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even when there is no case defining a constitutional right that directly mirrors the fact pattern confronted by the defendant, "'an official can be on notice that his conduct violates established law even in novel factual situations.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 731 (2002))). The touchstone of the "clearly established" inquiry is "fair warning." *Baynes*, 799 F.3d at 612-13 (quoting *Hope*, 536 U.S. at 741). "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

The qualified immunity defense may be raised at any stage of the case. When it is raised in a motion for summary judgment, as here, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott*, 550 U.S. at 380. That means that the court must view the facts in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378.

The Sixth Circuit recently reaffirmed the long settled principle that an arrestee has a clearly established Fourth Amendment right to be free from all manner of "gratuitous violence" during an

arrest, particularly where, as here, the apprehension is for a minor, non-violent crime, and where the evidence plausibly suggests that the suspect did not resist the attempted arrest. *Hughey v. Easlick*, 3 F.4th 283, ---, 2021 WL 2641884, at *5 (6th Cir. 2021); *see also Baker v. City of Hamilton*, 471 F.3d 601, 608 (6th Cir. 2006) ("'Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.'") (quoting *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) (collecting cases)). In this case, there is evidence from which a jury reasonably could find that clearly established right was violated. In *Hughey*, the court noted that it had "decided that a police officer's slapping a handcuffed plaintiff in the face constituted gratuitous violence notwithstanding the relatively minimal use of force applied and the absence of any resulting injury." 3 F.4th at ---, 2021 WL 2641884, at *6. The multiple taser shocks, closed fist beating, and repeated arm and leg strikes in this case grossly exceed the mere indignity of an open palm face slap, and there is every indication in the video record that before the first use of force, and before each of the following applications of force, the plaintiff offered no provocation to defendant Powers to justify his violent overreaction.

A defendant seeking judgment as a matter of law on his qualified immunity defense must establish either that the facts, taken entirely as proffered by the plaintiff, are insufficient to make out a violation of his clearly established right, or that no genuine dispute of material fact remains for trial as to any of the operative facts pertinent to the alleged violation. "If the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, it must deny summary judgment." *Thompson v. City of Lebanon, Tennessee*, 831 F.3d 366, 370 (6th Cir. 2016) (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015)); *see also Nelson v. City of Madison Heights*, 845 F.3d 695, 699 (6th

Cir. 2017) ("'A defendant challenging a denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'") (quoting *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011)); *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) ("[I]f the qualified immunity questions presented are fact-intensive, the record may not be adequately developed to evaluate the defense at the pleading stage under Rule 12(b)(6).") (citing *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015)).  In this case, the opposing views of the material facts and circumstances of the alleged use of force preclude application of the qualified immunity defense before trial, because a jury reasonably could accept either side's position on whether taser shocks and fist strikes were necessary to overcome "active resistance" by the plaintiff during the attempted arrest.  Moreover, summary judgment is inappropriate where a jury viewing the video of the incident reasonably could find that the plaintiff never "actively resisted" the apprehension.  *Hermiz v. Budzynowski*, No. 16-11214, 2017 WL 2546793, at *10 (E.D. Mich. June 13, 2017).

In this case, despite Shumate's expressions of verbal antagonism toward Officer Powers, his conduct reasonably could be viewed as not comprising any manifestation of outright hostility or physical aggression toward Powers.  Shumate did make rude gestures and insulting remarks toward Powers, but nothing in his demeanor throughout the encounter evidences any manifest intention to engage physically with defendant Powers — or even aggressively to approach him.  Shumate's demeanor and trajectory are more reasonably characterized as aggravation, apprehension, and retreat, rather than hostility or aggression.  Powers asserts that he was concerned that Shumate meant to retrieve a weapon when approaching his vehicle.  But that position is belied by the fact that, less than one minute earlier, immediately after Shumate arrived, Powers had ordered him to get back in his truck and leave the scene.  Shumate testified that it was his intent to

do just that.  He did not approach Powers while walking toward the truck, evidenced no intent to do so, and did not have to go near Powers to get into the truck and leave as he was told.  Moreover, it is undisputed that when the truck was searched no weapons were found.  The jury could conclude that a reasonable officer on the scene would not credibly have felt threatened by an unarmed suspect's mere attempt to comply with the officer's command issued just moments prior to leave the scene.  Finally, as the plaintiff points out, the credibility of Powers's version of the encounter is called significantly into question by his obvious attempts to minimize the severity of the force employed in his incident report, where he wrote that he delivered "palm heel strikes," "knee strikes," and "back hand strikes" while attempting to subdue the plaintiff, when photos taken by the plaintiff's daughter clearly show Powers about to punch the plaintiff with a closed fist.  *C.f.*, Incident Report dated Sept. 27, 2019, ECF No. 29-3, PageID.231; Photo Exhibit at PageID.206.

Shumate admits that he did not comply with Officer Powers's commands to get on the ground, present his hands, and be handcuffed.  However, it is settled in this circuit that noncompliance alone is not sufficiently "active" opposition to warrant the use of taser shocks to subdue a suspect who does not otherwise pose any immediate threat to officer safety.  *Goodwin*, 781 F.3d at 323-24; *Eldridge*, 533 F. App'x at 535; *Jackson*, 678 F. App'x at 306.  Although the plaintiff did retreat and withdraw his arm to evade Powers's grasp, his reaction fairly could be viewed by the jury as merely noncompliant rather than resistant.  He also attested that after he was pinned on the ground by Officer Powers, he only kept his arms in front of him and attempted to maintain an all-fours posture to avoid being slammed into the ground by Powers, who was bearing down on him with his considerably greater weight.  Shumate's reaction fairly can be viewed as not comprising any of the typical sorts of aggression that characterize "active resistance" according to the decisions on point.  *See Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 612 (6th Cir. 2020)

- 16 -

("This Court has identified active resistance where some outward manifestation — either verbal or physical — on the part of the suspect had suggested volitional and conscious defiance.") (citations and quotations omitted).

The Sixth Circuit has recognized that a "'deliberate act of defiance' using one's body can constitute active resistance, such as where a suspect resist[s] arrest by 'laying down on the pavement and deliberately locking his arms together tightly under his body while kicking and screaming.'" *Goodwin*, 781 F.3d at 326 (quoting *Eldridge*, 533 F. App'x at 534-35). But the plaintiff's conduct here reasonably could be found by a jury to involve, at most, only "passive resistance," or failure to comply with an officer's conflicting and confusing commands, followed by a nearly instantaneous deployment of violent force by the officer via repeated taser shocks, closed fist punches, and repeated hand and leg strikes. That merely "passive resistance" cannot suffice to justify the defendants' application of repeated taser shocks and other violent takedown moves. *Jackson*, 678 F. App'x at 307 ("We have held that a failure to present one's arms to an officer upon request without more is at most passive resistance, but that a physical struggle to maintain control of one's limbs while being placed in handcuffs can be active resistance.").

Moreover, the credibility of Officer Powers' account of the degree of resistance is called significantly into question by several relatively quiescent moments in the video where, at points, he lays his taser on the ground in order to free his fist to punch the plaintiff (depicted in photos taken by Amy Shumate), and where the video shows that he swapped his taser to an unready position in his left hand, holding the weapon by the business end, against the plaintiff's chest, obviously within the plaintiff's immediate reach, in order to casually retain the plaintiff with one arm, while using his free hand to activate his radio. "When no facts are in dispute, whether an official receives qualified immunity is a question of law." *Harris v. City of Circleville*, 583 F.3d

356, 364 (6th Cir. 2009).  However, the video evidence in this case is anything but plain and unequivocal, and in many respects, it supports the plaintiff's narrative of the events.

On similar facts where a suspect is merely verbally belligerent and noncompliant, but displays no physical aggression toward officers, the Sixth Circuit has found that a taser deployment was not justified by "active resistance."  *Kapuscinski*, 821 F. App'x at 613.

The defendants focus their briefing on the purportedly "undisputed" involvement of "active resistance" by the plaintiff.  The record does not support their argument that this fact is undisputed. And contrary to their position, that is not the only factor bearing on whether the use of force was reasonable in light of all the circumstances.  The Sixth Circuit has "said that '[i]n determining whether officers used excessive force, courts have placed great weight on officers' failure to warn a suspect before deploying a taser.'"  *Kapuscinski*, 821 F. App'x at 613 n.1 (quoting *Gradisher v. City of Akron*, 794 F.3d 574, 585 (6th Cir. 2015)).  The video here records no warning by Officer Powers that the taser would be used immediately if the plaintiff did not comply.  In fact it was drawn within six seconds after Powers shouted at the plaintiff to get away from his truck, and it was fired less than 10 seconds later, as the plaintiff retreated across the parking lot with his hands raised, while pleading with the defendant not to shock him.

Further, "[t]he general consensus among [Sixth Circuit cases] is that officers cannot use force . . . on a detainee who . . . is not told he is under arrest," *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009), unless it is "objectively apparent" that the suspect is being detained, *Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015).  The video also does not record any verbal suggestion by Officer Powers that he was attempting to arrest the plaintiff for anything before he drew and fired his taser.  Instead, what it depicts is an officer shouting contradictory commands and responding without warning or hesitation with overwhelming physical force when the plaintiff

failed to divine how he was expected to comply.  The jury reasonably could conclude that there was no objectively apparent indication to the plaintiff that he was being arrested for anything before he was shocked and beaten.  Unlike in other cases where the attempt to arrest was found to be objectively apparent, Shumate did not attempt to flee the scene and there was no hot pursuit suggesting that Powers's intent was to take him into custody for some offense.  *See Hall v. Huffman*, No. 14-02532, 2017 WL 1409971, at *6 (N.D. Ohio Apr. 20, 2017) ("For example, in *Cockrell v. City of Cincinnati,* 468 F. App'x 491 (6th Cir. 2012), 'the suspect's flight and the officer's subsequent pursuit made it clear to the suspect before the taser was fired that the officer intended to apprehend him.' *Ibid.* This in contrast to the facts in *Eldridge* and *Goodwin*, where the officers' mere request to 'step outside' does not make clear the officers' intention to detain the suspects.").

The severity of the supposed offense of arrest here also is a pertinent factor that weighs against a finding that violent force was justified to effect the arrest.  The plaintiff was charged with "resisting and obstructing" a police officer and later pleaded guilty to disorderly conduct.  Nothing in the video record shows him being anything more than merely annoying and insulting toward Officer Powers before Shumate was shocked, tackled, and beaten.

Where significant factual circumstances are in dispute that bear on the question of whether the force used was reasonable and the defendant acted in accord with clearly established federal law by deploying the specific force that he used, the case must be presented to the jury for decision and may not be resolved on summary judgment.  *Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000).  The case is not amenable to pretrial disposition on the record presented.

B.

The City of Adrian also asks for summary judgment.  Local governmental entities cannot be held liable under section 1983 solely for the acts of their agents; they are accountable under that statute only for their own conduct.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that "a municipality cannot be held liable [under section 1983] solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory").  The plaintiff, therefore, must point to an official policy, custom, or practice of that local government as the source of the constitutional violation.  *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).  And he must allege facts that show a causal connection between the policy and the injury.  *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012).

A police officer that violates a municipal policy that *prohibits* the use of excessive force will not subject the municipality to liability under section 1983.  Municipalities are only liable under section 1983 if it is the policy or custom that causes the alleged constitutional violation.  *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").  A violation of a benign policy by an individual rogue officer cannot sustain a constitutional claim against the city, because section 1983 liability cannot be established under the doctrine of *respondeat superior*.  *Monell*, 436 U.S. at 691.  Instead, to establish a *Monell* claim, the plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).  A "regular practice" of ignoring the city's use-of-force

policy might establish an unconstitutional municipal custom or practice. But to succeed on that theory, the plaintiff must offer evidence "showing . . . a history of widespread abuse that has been ignored by the City." *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (citing *City of Canton v. Harris*, 489 U.S. 378, 397 (1989)).

Shumate argues that the City's failure to require Powers to engage in remedial training, or to subject him to more severe discipline following the previous 15 citizen complaints about his conduct, amounted to a policy of acquiescence in Powers's violations of citizens' constitutional rights. The City contends that judgment as a matter of law on the plaintiff's *Monell* claim is warranted because none of the prior citizen complaints about Powers implicated any use of "excessive force" by him.

City of Adrian Police Chief Vincent Emerick testified that before the day in question, defendant Powers was the subject of 15 citizen complaints over a span of three years, and seven of those complaints resulted in "minor discipline." Emerick conceded that seven incidents resulting in discipline was a "high" number. Chief Emerick also concluded based on his review of the incidents that Powers displayed a "pattern of behavior where he aggravated situations," and he characterized the encounter with the plaintiff as another example of Powers's tendency to escalate situations toward the use of force, where force would not have been required with a more "patient" approach. However, despite the documented tendency to escalate situations toward use of unnecessary force, Powers received only "minor discipline" for prior, similar incidents consisting of "counseling by a supervisor." It was not until a complaint about the subject incident was lodge by Ms. Shumate that Powers was subjected to a brief five-day suspension.

To prevail on a failure-to-discipline theory against the City, the plaintiff must establish "deliberate indifference" by responsible officials to repeated infractions by officers, which requires

"a showing of a history of widespread abuse that has been ignored by the City." *Berry*, 25 F.3d at 1354. Similar and even fewer numbers of incidents where citizens were mistreated by officers with a tendency toward inappropriate treatment have been found to establish that "widespread abuse" was unmet by any appropriate supervisory response. *E.g.*, *Lipman v. Budish*, 974 F.3d 726, 748 (6th Cir. 2020) (six incidents); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989) (14 incidents). In this case, the record adequately suggests that defendant Powers engaged in a pattern of improper policing that repeatedly featured inappropriate escalation of encounters toward unnecessarily forceful altercations, and despite observing that alarming pattern the City chose to respond with nothing more than "counseling" and "memos" on the inappropriate behavior, rather than any substantial discipline. That is sufficient at this stage to sustain the plaintiff's *Monell* claim on a failure to discipline theory.

III.

Material fact questions remain about whether the force used by the defendant was reasonable under the circumstances, and the record does not indisputably establish facts that warrant disposition in the defendants' favor of the qualified immunity defense. The plaintiff also adequately has supported the failure to discipline premise of his *Monell* claim.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment (ECF No. 21) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 26, 2021